David W. CONNELL

v.

TOWN OF HUDSON; Albert Brackett.

Civ. No. 89–100–D.

United States District Court,
D. New Hampshire.

Feb. 23, 1990.

Sabin Willett, Boston, Mass., for plaintiff.

Craig L. Staples, Concord, N.H., for defendants.

## OPINION AND ORDER

DEVINE, Chief Judge.

In this civil action, David W. ("Nick") Connell claims that officials of the Town of Hudson, New Hampshire, violated his constitutional rights by ordering him away from the scene of an accident and threatening to arrest him if he persisted in taking pictures.[1] Presently before the Court are cross-motions for summary judgment.

### Background

Shortly after noon on July 9, 1987, two cars collided on Ferry Street in Nashua, New Hampshire. Police officers from the nearby town of Hudson, firemen, and emergency medical personnel responded. The driver of one car was seriously injured, but alive. The other driver, Mrs. Donna Cote, was killed.

David Connell, a Ferry Street resident and freelance reporter for the *Hudson News*, heard the collision, grabbed his camera, and rushed to the scene. From a distance of approximately twenty-five feet, Connell took a few preliminary pictures. A police officer asked him to move farther away.[2] Connell left the scene to get a telephoto lens, then returned to another area farther from the accident, as the officer had instructed. After taking a few pictures from that spot, Connell moved to a closer position, approximately thirty yards away from the cars. As Connell explains,

> At point No. 3 I'm not certain now, but my first next [sic] encounter with the law was a lady who came, and I don't know whether she was with the ambulance or with the police, I'm not sure to this day, but she came over and made a statement that we are about to move the body from the vehicle to the ambulance and that she would prefer I not photograph. It was left on an optional basis. There was no show of force or insistence. She said we would prefer. She was very ladylike.

Deposition of David W. Connell at 36 (Exhibit 2 of Defendants' Submission in Support of Motion for Summary Judgment). Connell moved to take pictures from another location. "I wanted to record the moment of transference as something in the sequence of the happenings that were taking place. I was not interested in photographing the body." *Id.* at 37. A vehicle was moved so that it blocked Connell's view of Donna Cote's car. Connell moved again and set up a tripod on a neighbor's lawn about forty yards from the accident. Another officer approached, and the following exchange took place.

> [The officer c]ame over to me and his words were, as I recall: We've been patient with you long enough and you'll have to take your camera and go down— and he indicated a point about where they had the barrier was. You'll have to go down there. You can photograph there if you want.
>
> And I says: I believe I have a right to photograph from here. (Indicating.)
>
> And he says: You do not. And he says: If you don't move, I'll put you in handcuffs and take you to—put you in jail.

*Id.* at 46. Connell moved "under protest." *Id.* at 57. He then got permission to enter a nearby house where he had seen people watching from a second-story window. As he prepared to take pictures from that window, an officer told him to stop photographing and leave the building. When Connell refused to leave, the officer went to police chief Albert Brackett.

> I went to—back to my—to the window and recommenced trying to set my camera up. And then Police Chief Brackett, being briefed that I had been not exactly cooperative, came to the window and reiterated all of the preceding demands that I stop photographing, that I come down

that side. Deposition of David W. Connell at ¶¶ 40, 54. According to Connell, another photographer from a local newspaper was allowed to take pictures from within the police perimeter. *Id.* at 71.

---

**1.** Jurisdiction in this civil rights case is founded on 28 U.S.C. § 1343(a). Plaintiff seeks declaratory relief under authority of 28 U.S.C. § 2201.

**2.** Police were enforcing a perimeter to the north of the accident. They would ask onlookers to move away if they approached the sidewalk on

out of the building, that they did not need a warrant.

And I asked him why—under what pretext he would arrest me, what had I done wrong. And he says the charge would be for disturbing the peace.

I says: That can't be. I says: I'm not disturbing anybody's peace. I says: I'm just photographing through a telephoto lens.

And he insisted that he was right, that what he was doing was legal and that I had to do it.

So I says, well, I says: I recognize who you are and your position. You're acting chief of police. And I says: In deference to that, I will come down and desist from photographing but I want you to understand that it's under protest and it is not the end of it.

*Id.* at 68–69.[3]

Connell contends that the police violated his constitutional rights. Originally, he was interested in no more than an apology and a promise that the police would not again prevent individuals "from lawfully photographing whatever they choose." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 18. As explained in a letter from plaintiff's counsel to Alice Monchamp, the Town of Hudson's acting administrator,

We believe that the principle that the police must not be permitted to interfere with lawful news-gathering activities is significant enough to warrant bringing an action, even where money damages may not be great. However, neither Mr. Connell nor I would pursue that remedy if we felt that we could obtain the town's recognition of the important principles discussed. Thus, I propose the following. If you, on behalf of the town and the police department, will write a letter to Mr. Connell, apologizing to Mr. Connell for the police department's error,

acknowledging that the actions of certain police officers on July 9, 1987 violated Mr. Connell's first and fourth amendment rights, acknowledging that the police department recognizes that it is improper for it to attempt to dictate matters of taste in news gathering, and acknowledging that the police department will not, in future, exceed its lawful function with respect to press coverage of accident scenes, we will agree to release the Town and the Department from all rights Mr. Connell has against the town or the police department on the basis of the events described.

October 6, 1988, letter at 3 (plaintiff's Exhibit 4, attached to plaintiff's Motion for Summary Judgment). The requested letter was sent by Ms. Monchamp on December 6, 1988; the apology is quoted below.

[S]ince the stated intent of Mr. Connell is not to seek monetary compensation or retribution, I believe I can satisfactorily reply to your letter of October 16, 1988 as follows. I have discussed this matter with Chief Brackett who has consulted with the County Attorney and with Town Attorney Dicola. He acknowledges that a citizen, in particular a news reporter or photographer, has the right to cover accident or crime scenes and investigations in public places, including the right to take photographs of the scene, as long as they do not directly interfere with the police investigation or disturb or remove evidence from the crime or accident scene. Chief Brackett has informed me that it is and will continue to be the policy of the Hudson Police Department to respect the right of citizens to cover accident or crime scenes in public places barring direct interference with an investigation or the disturbance or removal of evidence from the scene.

I hope this letter allays your concerns on the policy affecting Mr. Connell and other similarly situated citizens.

---

**3.** Chief Brackett generally agrees with the account of events given by David Connell, with two notable exceptions. Chief Brackett states that he and his officers only asked Connell to do two things: (1) stay outside the area of the accident, and (2) refrain from photographing Mrs. Cote's uncovered body. Affidavit of Albert M. Brackett at ¶ 8. According to Chief Brackett, the confrontations only occurred because Connell "repeatedly intruded beyond the established police perimeter," *id.* at ¶ 6, and because Brackett was told "that the paramedics would refuse to remove the body until Connell was stopped in his efforts to photograph it." *Id.* at ¶ 7.

Plaintiff's Motion for Summary Judgment, Exhibit 5. Plaintiff found this apology unsatisfactory, and a few months later he filed the instant lawsuit.

### Discussion

Plaintiff asserts that the events described above violated rights guaranteed him by the First and Fourth Amendments to the United States Constitution. Plaintiff's Fourth Amendment argument is not persuasive. The Fourth Amendment reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Plaintiff argues that a Fourth Amendment "seizure" occurs "when one acting under color of state law, by means of physical force or show of authority, in some way restrains a citizen's liberty." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 15. The Court declines to adopt such an expansive view of a "seizure". A more precise definition is provided in *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980).

> [A] person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. *United States v. Martinez–Fuerte*, 428 U.S. 543, 554 [96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976)]. As long as the person to whom questions are put

remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

▪ Nothing in the record suggests that Connell was prevented from leaving the scene at any time. The Court therefore rejects his Fourth Amendment claim. The Court does, however, find merit in plaintiff's First Amendment claim.

▪ News gathering is protected by the First Amendment, but the protection is not absolute. For example, the court in *Garrett v. Estelle*, 556 F.2d 1274 (5th Cir.1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978), held that the First Amendment did not require the State of Texas to allow a news cameraman to film executions in state prison; in *Seymour v. United States*, 373 F.2d 629 (5th Cir.1967), it was held that the First Amendment did not prohibit a court from assessing a fine against a television news cameraman for filming outside the courtroom in violation of a standing court order; and in *Galella v. Onassis*, 353 F.Supp. 196 (S.D.N.Y.1972), *modified*, 487 F.2d 986 (2d Cir.1973), the court held that a "paparazzi's" harassing conduct was not protected by the First Amendment, but rather violated the subject's common law, statutory, and constitutional rights.[4]

General principles governing the relation between the media's First Amendment right to gather news and government's power to regulate require a balancing of the two interests involved. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–81, 14 L.Ed.2d 179 (1965). At the same time, "a right to gather news, *of some dimension*, must exist." *Branzburg v. Hayes*, 408 U.S. 665, 728, 92 S.Ct. 2646, 2673, 33 L.Ed.2d 626 (1972) (Stewart, J., dissenting) (emphasis in original). And, as the court majority in the *Branzburg* decision noted, "newsgathering is not with-

---

4. The terms "paparazzi" or "paparazzo" have been defined as "literally a kind of annoying insect, perhaps roughly equivalent to the English 'gadfly'." *Galella, supra*, 487 F.2d at 991–92.

out its First Amendment protections," *id.* at 707, 92 S.Ct. at 2669, "for without some protection for seeking out the news, freedom of press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656. *See also, Houchins v. KQED, Inc.*, 438 U.S. 1, 32, 98 S.Ct. 2588, 2605, 57 L.Ed.2d 553 (1978) (Stevens, J., dissenting) ("information gathering is entitled to some measure of court protection").

The Court is aware of three cases in which other courts have measured the degree of protection to which a photographer is entitled. Each case considered the balance between a newsman's right to take pictures and the government's power to limit the exercise of that right.

In *Channel 10, Inc. v. Gunnarson*, 337 F.Supp. 634 (D.Minn.1972), that balance was struck in the newsman's favor. Dennis Anderson, a news cameraman for Channel 10 in Duluth, Minnesota, rushed to the scene of a burglary. He stood on a public sidewalk, filmed through a store window and, for about five seconds, turned on his light. Two police officers told Anderson to stop filming. They confiscated his camera, and one of the policemen told Anderson "he would give the camera back to him on the condition that Anderson check with the Detective Bureau on whether the film contained information detrimental to the prosecution of the subjects and whether or not the subjects filmed were juveniles." *Id.* at 636. The court found these restrictions unlawful.

> The stipulated facts clearly indicate that the general public was present and, in fact, an affidavit shows one member of the public was standing beside plaintiff Anderson. Defendants have made no claim before this court that Anderson was in an improper place and it seems

clear that employees of the news media have a right to be in public places and on public property to gather information photographically or otherwise.

*Id.* at 638. Underlying the *Gunnarson* decision is the proposition that those who gather news "have a constitutional right not to be interfered with" by the police so long as they "do not unreasonably obstruct or interfere with the defendant's official investigations of physical evidence or gain access to any place from which the general public is prohibited for essential safety purposes." *Id.* (quoting *Gazette Publishing Co. v. Cox*, Cause No. IP 65–C–528 (S.D. Ind. May 2, 1967)).

In *Mazzetti v. United States*, 518 F.2d 781 (10th Cir.1975), and *State v. Lashinsky*, 81 N.J. 1, 404 A.2d 1121 (1979), the balance was struck in the government's favor. The *Mazzetti* opinion affirmed a decision to jail a news photographer who violated a court rule which prohibited photography within the court "environs". "[T]he threat to the judicial process portended by Mazzetti's activity was sufficiently immediate to justify the rule as a reasonable, before-the-fact measure against interference with the court and its functions." *Mazzetti, supra,* at 782–783.[5] And in *Lashinsky*, the New Jersey Supreme Court upheld a news photographer's arrest on charges of disorderly conduct for refusing to move back from the scene of a gory fatal car accident, thus impeding the performance of a trooper's duties in securing the area.

To resolve the issue raised in the instant case, the Court must determine whether the restrictions placed on Nick Connell were reasonably justified. The Court finds that they were not.

> Of special significance in determining the propriety of Mazzetti's incarceration was the fact that the prisoners "were orderly when they were put aboard the bus. As the recited incident occurred, they became noisy and hostile, yelling obscenities and climaxing the event by throwing parts of their clothing through the windows as the bus departed." *Mazzetti, supra,* at 782.

---

**5.** Mazzetti had entered the parking lot of a federal courthouse in Leavenworth, Kansas, in spite of express instructions from the marshal that he not do so. He began to photograph prisoners being led to a bus. The marshals told Mazzetti to leave, and then escorted him to the public sidewalk. But when the marshals turned, Mazzetti went back, again taking pictures. Mazzetti was then arrested and placed in a holding cell (where he continued to take pictures).

The undisputed facts demonstrate that Connell followed all instructions reasonably designed to prevent interference with police and emergency activities. Although he may have crossed a police perimeter, that perimeter was not clearly delineated, and, when asked to move, he moved. He left the scene to retrieve a telephoto lens that would enable him to take the pictures he needed from a distance. And he did not thereafter improperly approach the accident area. It is hard to imagine how Connell could have interfered with police or emergency activities by taking pictures from the second floor of a house that others were using to view the accident.

Defendants' most persuasive argument is that emergency personnel refused to remove Mrs. Cote's body until Connell stopped taking pictures. But even that fact does not provide the justification necessary to withstand judicial scrutiny. Although the emergency personnel and police may have thought it wrong for Connell to photograph the accident, it is not for them to protect "the privacy rights of the victim Mrs. Cote and the sensibilities of her family," Defendants' Motion at 3, even in an attempt to curtail what they thought were the voyeuristic interests of a freelance photographer.[6] As made clear by the United States Supreme Court, such are the dangers intrinsic to our notion of a free press.

We are aware that the press has, on occasion, grossly abused the freedom it is given by the Constitution. All must deplore such excesses. In an ideal world, the responsibility of the press would match the freedom and public trust given it. But from the earliest days of our history, this free society, dependent as it is for its survival upon a vigorous free press, has tolerated some abuse. In 1799, James Madison made the point in quoting (and adopting) John Marshall's answer to Talleyrand's complaints about American newspapers, American State Papers, 2 Foreign Relations 196 (U.S.Cong.1832):

> " 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.'* " 6 Writings of James Madison, 1790–1802, p. 336 (G. Hunt ed. 1906) (emphasis in original).

*Rosenbloom v. Metromedia,* 403 U.S. 29, 51, 91 S.Ct. 1811, 1823, 29 L.Ed.2d 296 (1971). According to principles of jurisprudence long respected in this nation, Chief Brackett could not lawfully interfere with Nick Connell's picture-taking activities un-

---

**6.** As evidenced by this exchange, Connell contends that he wasn't interested in getting a picture of Mrs. Cote's body.

Q. All right. You did not intend to photograph the body uncovered; is that correct?
A. Never had any such intention. I would never want to.
Q. And you were going to—you assumed that the body would be covered during that process?
A. That's right.
Q. And that was what you intended to photograph?
A. That's right.
Q. Did you explain that to either the paramedics or any police officer?
MR. WILLETT: Objection. You may answer.
A. I did not explain it. I was given no opportunity to explain it. The officer identified came over to me and he said, and his words were: We've been patient with you long enough. He says: You either move down here (indicating) and photograph from there or I'll put you in handcuffs and take you to jail.
Connell Deposition at 56–57.

less Connell unreasonably interfered with police and emergency functions.

Defendants make much of their argument that the limitation placed on Nick Connell's picture taking were reasonable because Connell's action invaded Donna Cote's right to privacy. The Court does not accept defendants' paternalistic view of police authority.

It is beyond dispute that government has, in extraordinary circumstances, a responsibility to protect highly sensitive information against public dissemination. But the principles enunciated in *The Florida Star v. B.J.F.*, —— U.S. ——, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), do not apply as defendants contend they do. In *Florida Star*, the Supreme Court refused to allow a rape victim to collect a $100,000 jury award from a newspaper for publishing the victim's name. Although Florida statute § 794.03 (1987) made such publication unlawful, the Supreme Court held that the First Amendment protected it from punishment by state officials.

> Our holding today is limited. We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the State may protect the individual from intrusion by the press, or even that a State may never punish publication of the name of a victim of a sexual offense. We hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest is satisfactorily served by imposing liability under § 794.03 to appellant under the facts of this case.

*Florida Star, supra,* 109 S.Ct. at 2613.

The case at bar does not invoke "information entrusted to the government." Defendants' Memorandum at 10 (quoting *Florida Star, supra,* 109 S.Ct. at 2609). Logically extended, defendants' position would permit police to "protect" access to any public place which they felt was sufficiently sensitive to involve some citizens' "zone of privacy." Defendants' Memorandum at 12. Defendants' attempt to bootstrap an expanding common-law tort doctrine onto the exercise of police power cannot prevail. Contrary to defendants' contention, it is not Mrs. Cote's right to privacy, protected by the police, which must be weighed against plaintiff's right to gather news. The appropriate analysis balances plaintiff's rights against police authority to secure an accident scene. Under the facts presented here, that balance plainly favors the plaintiff.

The Court also rejects defendants' assertion that Chief Brackett is protected by qualified immunity. In federal civil rights actions, government officials are entitled to qualified immunity for their discretionary acts. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine if an official is immune from liability, the Court looks at the " 'objective reasonableness' " of the official's conduct and determines whether that conduct violated "clearly established statutory or constitutional rights." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson, supra,* 483 U.S. at 640, 107 S.Ct. at 3039. *See also Rodriguez v. Comas,* 875 F.2d 979 (1st Cir.1989).

Reasonable police officers understand that their authority has well-defined limits. Albert Brackett, at the time of this incident the acting chief of Hudson's police department, can be fairly held to the understanding that he could not chase a photographer away from an accident unless that photographer was unreasonably interfering with police activity. The record in the instant case suggests no such interference.

Moreover, it appears that Chief Brackett well understood the parameters of his lawful authority. Alice Monchamp, acting town administrator, noted that Chief Brackett "acknowledges that a citizen, in particular a news reporter or photographer, has the right to cover accident or crime scenes and investigations in public places,

including the right to take photographs of the scene, as long as they do not directly interfere with the police investigation or disturb or remove evidence from the crime or accident scene." Dec. 6, 1988, letter (Plaintiff's Motion for Summary Judgment, Exhibit 5). Chief Brackett's assertion of qualified immunity therefore must fail.

■ Defendants also argue that this suit may not be maintained against the Town of Hudson because plaintiff has not demonstrated that the actions about which he complains result from Town "policy" or "custom". Defendants' argument derives from *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the United States Supreme Court declared that municipalities could be held liable for damages in an action based on 42 U.S.C. § 1983 only if the violation of civil rights was caused by the municipality's policy or custom. Following *Monell,* courts have struggled to define the terms "policy" and "custom". *See generally* Annotation, *What Constitutes Policy or Custom for Purposes of Determining Liability of Local Gov't Unit Under 42 U.S.C.S. § 1983—Modern Cases,* 81 A.L.R.Fed. 549 (1987).

The *Monell* formulation has recently been clarified.

> *Monell* is a case about responsibility. In the first part of the opinion, we held that local government units could be made liable under § 1983 for deprivations of federal rights, overruling a contrary holding in *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1971). In the second part of the opinion, we recognized a limitation on this liability and concluded that a municipality cannot be made liable by application of the doctrine of *respondeat superior.*

*Pembaur v. Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986). The *Pembaur* majority thought it "plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480, 106 S.Ct. at 1298.

But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell, supra,* [436 U.S.] at 694 [98 S.Ct. at 2037], and whose decisions therefore may give rise to municipal liability under § 1983.

*Id.*

Identification of policymaking officials for this purpose is a question of state law. *St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Under New Hampshire law, a police chief has "authority to direct and control all employees of his department in their normal course of duty." New Hampshire Revised Statutes Annotated chapter 105:2–a (1973). The Court has little difficulty concluding that Chief Brackett's conduct during the July 9, 1987, confrontation represented Town of Hudson policy.

Moreover, the letter from town administrator Alice Monchamp manifests the Town's support for Chief Brackett's action. And, as plaintiff points out, defendants have admitted that "at all relevant times defendant Brackett and other police officers present at the accident scene described in plaintiff's Complaint were carrying out the lawful policy, practices and custom of the defendant Town of Hudson." Answer at ¶ 14.

Town of Hudson policymakers provided more than "after-the-fact approval of alleged police misconduct," as defendants contend. Defendants' Memorandum at 22 (quoting *Ramirez de Arellano v. Municipality of San Juan,* 685 F.Supp. 309, 313 (D.P.R.1988)). Under the facts, the Town cannot avoid liability. *Compare Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986) (municipality may be liable if official's actions were carried out with "supervisory encouragement, condonation, or even acquiescence").

The Court also rejects defendants' assertion that this action presents no "case or

controversy" justifying judicial resolution. A similar contention was rejected in *Gunnarson, supra,* 337 F.Supp. at 637. Moreover, as stated by a respected commentator,

> There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred. The Court is then merely asked, as in any litigation, to determine the legal consequences of past events and it is immaterial that it may be the one allegedly liable, rather than the person to whom he would be liable, who asks for the judicial determination.

10a Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2757, at 585 (1983).

■ Defendants' contention that they are entitled to judgment because plaintiff has not demonstrated *actual* damages is no more compelling. Nominal damages are available under section 1983. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978); *Bradley v. Coughlin,* 671 F.2d 686, 690 (2d Cir.1982); *Joseph v. Rowlen,* 425 F.2d 1010 (7th Cir.1970); *Rogers v. Kelly,* 674 F.Supp. 1372, 1374 (E.D.Ark.1987), *aff'd,* 866 F.2d 997 (1989); *Katris v. City of Waukegan,* 498 F.Supp. 48, 54 n. 4 (D.Ill.1980).

When presented with cross-motions for summary judgment, the Court reviews the record presented, and if it "finds that *some* genuine factual issue remains in the case, where resolution one way or another *could* affect its outcome," the motions must be denied. *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 895 (1st Cir.1988). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court here finds no genuine issue of material fact, but instead finds that the record presented requires judgment in plaintiff's favor. That record persuades the Court that Connell did not interfere with the work of police and emergency medical personnel. Thus, Connell's motion

for summary judgment (document no. 11) must be and herewith is granted; defendants' motion for summary judgment (document no. 10) is denied.

Accordingly, for the reasons stated hereinabove, the Court declares that David Connell's rights, protected from government intrusion by the First Amendment to the United States Constitution, were violated by Town of Hudson police when they ordered him to stop taking pictures from positions that did not interfere with police activity. As plaintiff has identified only speculative "actual" damages,[7] the Court finds that he is entitled to recover no more than nominal damages. Thus, defendants are herewith ordered to provide payment in the amount of one dollar ($1.00).

As a prevailing party, 42 U.S.C. § 1988 permits plaintiff to recover attorney's fees, and upon submission of appropriate documentation, *see* Local Rule 39, the Court will consider plaintiff's request for such fees.

SO ORDERED.

---

7. At his deposition, Connell testified that there was no guarantee that his pictures would be used or that he would receive payment even if they were used. "There was no specifics on that. I just—I was kind of more interested in getting credit for it, that they usually pay five or ten dollars for a photograph or something like that, but it would be nice just to get a credit in the Telegraph." Connell Deposition at 70.