ACCEPTED
03-15-00270-CV
7731813
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/6/2015 6:06:05 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00270-CV

_____

<table>
<tr><td>

**IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS**

</td><td>

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/6/2015 6:06:05 PM
JEFFREY D. KYLE
Clerk

</td></tr>
</table>

_____

SUZANNA ECKCHUM
*Appellant*

V.

THE STATE OF TEXAS
*Appellee*

_____

ON APPEAL FROM THE COUNTY COURT AT LAW 2,
COMAL COUNTY, TEXAS, CAUSE NO. C-2014-1690C,
HONORABLE CHARLES A. STEPHENS, JUDGE PRESIDING

_____

**BRIEF FOR APPELLEE**

_____

**Jennifer Tharp
Criminal District Attorney**

**By
Nicholas D. Robinson
SBN: 24067844
Prosecutor
150 N. Seguin Avenue, Suite #307
(830) 221-1300
Fax (830) 608-2008
New Braunfels, Texas 78130
E-mail: robinn@co.comal.tx.us
Attorney for the State**

**Oral Argument Is Requested**

## Identity of Parties and Counsel

### Attorney for the Appellant, Suzanna Eckchum

*For the Appellant at Hearing*
Lynn Berry Morris
P.O. Box 1343
Wimberley, TX 78676

*For the Appellant on Appeal*
Mysha Lubke
Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701
Phone: (512) 322-2500
Fax: (512) 322-2501
E-mail: mysha.lubke@bakerbotts.com

### Attorneys for the Appellee, Hal Ketchum

*For the State at Hearing*
Nicholas D. Robinson
Prosecutor
COMAL COUNTY CRIMINAL
DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: robinn@co.comal.tx.us
SBN: 24067844

*For the State on Appeal*
Nicholas D. Robinson
Prosecutor
COMAL COUNTY CRIMINAL
DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: robinn@co.comal.tx.us
SBN: 24067844

# TABLE OF CONTENTS

Index of Authorities ...........................................................................................iv

Statement of Facts ...........................................................................................1

Summary of the Argument.................................................................................18

Standard of Review ...........................................................................................21

Argument............................................................................................................24

Prayer .................................................................................................................58

Certificate of Service .........................................................................................59

Certificate of Compliance ..................................................................................59

# INDEX OF AUTHORITIES

**Statutes:**

Tex. Crim. Pro. Code. Art. 7A.04 .................................................................54

Tex. Crim. Pro. Code. Art. 7A.05 ............................................................47, 56

Tex. Crim. Pro. Code. Art. 7A.07(a) .......................................................47, 56

Tex. Fam. Code Ann. §82.008 ................................................................51, 52

Tex. Fam. Code Ann. §82.041 ......................................................................53

Tex. Pen. Code Ann. §6.03(b) ......................................................................26

Tex. Pen. Code. §25.07 ......................................................................43, 44, 46

Tex. Pen. Code Ann. §42.072 .......................................................................25

Tex. R. App. P. 33.1(a)(1) .......................................................................23, 40

Tex. R. App. P. 33.2(e)(1) ...............................................................23, 49, 57

Tex. R. Civ. P. 301 ......................................................................................53

Tex. R. Civ. P. 322 ...........................................................................23, 40, 41

**Cases:**

*Allen v. State*, 218 S.W.3d 905 (Tex. App.—Beaumont 207, no pet.)..............26, 31

*BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789 (Tex.2002)................23

*Champagne v. Gintick*, 871 F. Supp. 1527 (D. Conn. 1994)............................47, 48

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005)...........................................22

*Clements v. State*, 19 S.W.3d 442 (Tex. App.—Houston [1st Dist.] 2000, no pet.)................................................................................................24, 45

*Cohen v. California*, 403 U.S. 15 (1971).........................................................24, 45

*Connell v. Town of Hudson*, 733 F. Supp. 465 (D.N.H. 1990)..............................45

*Ex Parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012) .............................49, 50

*Ex parte Ghahremani*, 332 S.W.3d 470 (Tex. Crim. App. 2011) ....................49, 50

*Franklin v. Benton-Elam*, 06-13-00126-CV, 2014 WL 1722165 (Tex. App.—Texarkana Apr. 30, 2014, no pet.)(not designated for publication) ......37, 38

*Garcia v. State*, 212 S.W.3d 877 (Tex. App.—Austin 2006, no pet.).....................46

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .................................47

*GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).........................................22, 33

*Hansen v. State*, 224 S.W.3d 325 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) .........................................................................................................27, 28

*Hart v. State,* 89 S.W.3d 61 (Tex.Crim.App.2002) .........................................26, 27

*Heidelberg v. State*, 144 S.W.3d 535 (Tex. Crim. App. 2004) ..............................42

*Hutton v. State*, 313 S.W.3d 902 (Tex. App.—Amarillo 2010, pet. ref'd).............32

*In re L.M.I.*, 119 S.W.3d 707 (Tex. 2003) .....................................................23, 40

*Kissman v. Bendix Home Sys., Inc.*, 587 S.W.2d 675 (Tex. 1979)........................55

*Lancaster v. Lancaster*, 01-12-00909-CV, 2013 WL 3243387 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.)(not designated for publication) ..........................................................23, 40, 48, 49, 57

*Lewis v. S. S. Baune*, 534 F.2d 1115 (5th Cir. 1976)............................................47

v

*Long v. State*, 931S.W.2d 285 (Tex. Crim. App. 1996) ....................................24, 45

*Lozano v. Lozano,* 52 S.W.3d 141 (Tex.2001) ......................................................22

*Mansions in the Forest L.P. v. Montgomery Cnty.*, 365 S.W.3d 314 (Tex. 2012) ...............................................................................................................23, 40

*McGowan v. State*, 375 S.W.3d 585 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd)..................................................................................................26, 33

*Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003) .....................................................42

*Ortiz v. Jones,* 917 S.W.2d 770 (Tex.1996) .........................................................22

*Ploeger v. State*, 189 S.W.3d 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ........................................................................ 24, 28, 30, 31, 45, 46

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)...........................................47

*Riley v. State*, 01-95-01020-CR, 1997 WL 72013 (Tex. App.—Houston [1st Dist.] Feb. 13, 1997, pet. ref'd)(not designated for publication) ............................57

*Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840 (Tex. 1979) .................................................................................................................50

*Siefkas v. Siefkas*, 902 S.W.2d 72 (Tex. App.—El Paso 1995, no writ) ................50

*Smith v. Martens*, 279 Kan. 242 P.3d 28 (2005)..................................................47

*State for Prot. of Cockerham v. Cockerham*, 218 S.W.3d 298 (Tex. App.— Texarkana 2007, no pet.)..................................................................................53

*Swain v. State*, 181 S.W.3d 359 (Tex. Crim. App. 2005).......................................42

*Teague v. State*, 06-14-00053-CR, 2015 WL 2236642 (Tex, App.— Texarcana May 13, 2015, no. pet. h.) ...........................................................27, 31

*Teel v. Shifflett*, 309 S.W.3d 597 (Tex. App.—Houston [14th Dist.] 2010, pet. denied)..............................................................................................................56

*Townsend v. Collard*, 575 S.W.2d 422 (Tex. Civ. App.—Fort Worth 1978, no writ) ................................................................................................23, 40

*Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328 (Tex.1998) .................22

*Valdez v. Valdez*, 930 S.W.2d 725 (Tex. App.—Houston [1st Dist.] 1996, no writ) ...............................................................................................................23

## **Other Authorities:**

U.S. Const. amend. I. .......................................................................................24

# STATEMENT OF FACTS

### A. Initial Application for Protective Order:

On December 16, 2014, the State filed an Application for Protective Order on behalf of Mr. Hal Ketchum. CR 4. In the application, he was named as a "victim of stalking," and the front page of the application stated that there was a "clear and present danger of stalking if the order was not granted." *Id.* The first paragraph of the application also stated that the order was being sought pursuant to Chapter 85 of the Texas Family Code. *Id*. Mr. Ketchum provided a signed affidavit stating that he was a victim of stalking for the past fifteen years and that he had a prior "restraining order" against Suzanna Eckchum out of Tennessee. *Id*. at 8. The court issued a Temporary Protective Order prohibiting Suzanna Eckchum from "committing stalking" against Mr. Ketchum. *Id*. at 10.

### B. Hearing on Final Protective Order:

On January 16, 2015, a hearing on the Final Protective Order was conducted before the Honorable Judge Charles A. Stephens of the County Court at Law 2, Comal County, Texas. 2 RR 1. At the hearing, attorney for Appellant, Patty Morris, stated the State was pursuing a Stalking Protective Order, as opposed to a family violence protective order. *Id*. at 6. The trial court informed Ms. Morris that it understood the type of order being sought, and that the application, filed on

1

December 16, 2014, stated that it was in fact a Stalking Protective Order. Ms. Morris noted that the application included language referring to Chapter 85 of the Texas Family Code, giving rise to possible confusion. *Id.* at 8. The Court pointed out there was only one reference to Chapter 85 made in the application and that it was clearly a Stalking Protective Order based on the language in the application. Mrs. Morris responded: "I understand that she's been accused of stalking. We are here. We've obviously received notice. I just want to clarify to the court this is not a family violence [protective order]." *Id.* at 9. At no time did Appellant object or complain of lack of notice or due process, even when the court asked if she was raising the issue. *Id.*

**C. Testimony from Appellee at Hearing on Final Protective Order:**

The State called Mr. Hal Ketchum as its first witness. Mr. Ketchum testified that he was a very successful country music performer and had been making records for the past thirty years. *Id.* at 10-11. He initially met Appellant and her son in 1994 or 1995, at a club during a "meet and greet" where he signed an autograph for her. *Id.* at 12, 24. At that meeting, she stayed at the back of the line, which concerned Mr. Ketchum because he knew from experience that the people at the back of the line usually wanted to "capitalize on as much of your time as they can get." *Id.*

2

He saw Appellant again in 1997 when he opened the drapes of his home in Nashville and saw her standing in his yard. *Id.* at 13. A police report of the incident was made to local police. *Id.* After that, Appellant began showing up at his children's school, taking pictures of his grandchildren, and following him and his family around the grocery store. *Id.* at 13, 15. He even observed her going through his mailbox and sorting through his mail. *Id.* at 13, 48.

Appellant would constantly show up at his wife's place of work. *Id.* at 14. Mr. Ketchum testified that he believed he had a restraining order in place against Appellant in accordance with an anti-stalking law in Nashville. *Id.* On cross examination, Appellant's attorney asked him whether he had a copy of the "protective order," and he stated he did not. *Id.* at 27. Mr. Ketchum continued to insist that he had either a protective order or restraining order out of Tennessee, at times using the terms interchangeably. *Id.* The District Attorney's office did not offer a protective order into evidence. *Id.* When the Court asked whether the State had a copy, its representative, Mr. Robinson, stated that only a police report was in its possession, which Appellant also had. *Id.* at 28. The trial court, having been made aware of the facts, proceeded with testimony. *Id.* Mr. Ketchum was subject to a full and open cross examination regarding whether an actual protective order or restraining order was in place in Tennessee or whether only a police report of

Appellant's stalking behavior was documented, and the trial court was fully informed of these facts. *Id.*

Mr. Ketchum also testified that, during concerts, he was forced to tell police not to allow Appellant into the building when he was performing. *Id.* at 15. Appellant followed Mr. Ketchum's ex-wife into the restroom on several occasions and he was forced to stop playing in order to make sure she was safe. *Id.* He testified that the behavior was frightening. *Id.* Appellant constantly sent her adolescent son backstage in an attempt to make contact with Mr. Ketchum, and the incidents got so bad that Mr. Ketchum had to tell his manager not to allow the son or the mother backstage access. *Id.* at 50-51.

At one point he was informed by his management team that Appellant was trying to pitch him a song and wanted to write a book about him. *Id.* at 30. She was refused and asked to leave by his management team. *Id.* at 31. On cross examination, Appellant's attorney asked "if a person had an idea or wanted to pitch something to you [Mr. Ketchum], would that not be the proper thing to do?" *Id.* Mr. Ketchum, having thirty years of industry experience, replied "no, there's nothing professional about that. If somebody says no thank you very much that should be the end of it, as with the pictures of my grandchildren, as with all of the above. No thank you." *Id.*

4

At an unknown date, Mr. Ketchum moved to Austin, Texas, then back to Nashville, Tennessee. *Id*. at 40. According to his affidavit, he and his family finally settled in Fischer, Texas, in Comal County, in October of 2013. CR 8. Though he provided this date in his affidavit, Mr. Ketchum was not entirely sure of the exact dates he moved between Texas and Tennessee, though multiple moves were made. 2 RR 40-41.The specific dates of many of his concerts were also not known, since Mr. Ketchum has performed over one thousand shows. *Id.* at 25. What he was certain of, however, was that Appellant continued to stalk him and his family, again appearing in his yard on another occasion in Tennessee. *Id.* at 41.

In Comal County, he lived on Fischer Store Road, and Appellant moved approximately three miles away from his home. *Id*. at 15. From the back steps of a store in the area, approximately one hundred feet from his property, Appellant would take pictures of his house and children. *Id*. On three occasions, she trespassed on his property. *Id* at 36. Mr. Ketchum stated that he knows what her car looks like because she constantly follows him and that "she's followed [him] about four feet behind [him] all the way to Ace Hardware, all the way to Brookshire Brothers in Wimberley time and time again." *Id*. When asked whether it was merely a coincidence that Appellant used the same road that Mr. Ketchum uses to enter the town of Wimberley, Mr. Ketchum stated "…no. This is specific.

5

This has specifically occurred on more than one occasion…when I stop to pick up my daughter at school suddenly there she is." *Id*. at 38.

On January 23, 2014, Mr. Ketchum was out with his family for a birthday gathering at an establishment called Gruene Hall. *Id*. at 16. Appellant was also at the establishment, standing at the bar and mimicking Mr. Ketchum's gestures. *Id*. Mr. Ketchum and his family decided to leave. As they were walking toward their vehicle, Appellant suddenly stepped out of the bushes two or three feet behind them. *Id*. Mr. Ketchum turned and asked her to leave him and his family alone. *Id*. Appellant then made a gesture with her hand in the shape of a gun and stated: "mess with me and you will be sorry." *Id*. at 17. According to Mr. Ketchum, he "went off on her." *Id*. He told her to stay away from him and that the harassment and stalking had been going on for sixteen years and that he just wanted to be left alone. *Id*. Mr. Ketchum's seventeen year-old daughter, Rose, distraught and frightened by the incident, ran into a shop and refused to come out for a period of time. *Id*. at 17.

On December 7, 2014, Mr. Ketchum's daughter was followed and stalked by Appellant around the town square in Wimberley, Texas, while she and a group of friends attempted to shop. Appellant's behavior forced the daughter and friends to finally leave the area. *Id*. at 18. Within a one year period of time, in 2014, Appellant followed Mr. Ketchum to at least six of his shows, and in November of

that year Mr. Ketchum again saw Appellant taking pictures of his home. *Id*. at 17-18.

On June 14, 2014, Mr. Ketchum was playing at a benefit concert at a newly built hospital in New Braunfels, Texas. *Id*. During his performance, Appellant walked in front of his children and grandchildren and began "constantly taking pictures of them during the whole experience." *Id*.

In his testimony, Mr. Ketchum stated that he was "absolutely" in fear for his safety. *Id*. at 19. He characterized Appellant as "relentless" despite telling her to stop on numerous occasions over an approximate sixteen year period of time. *Id*. He stated, "I lay in bed some nights and think there might be a bullet that will come through my house. I'm frightened for my life, honestly." *Id*. He also explained that he understood he was a person in the "public eye" and was accustomed to getting his picture taken regularly, but described Appellant's behavior as being very different, and explained that he had a publicist and "anybody [who] wants to take my picture gets permission to take my picture. If I'm in an autograph line my tour manager say, okay, camera, camera, camera, yes, yes, no, occasionally. I constantly now look out my window, okay, waiting for the next drive-by. Sounds kind of paranoid, but it's come to that." *Id*. at 19-20.

Even more concerning, Mr. Ketchum noted that when he first met Appellant she went by the name of Susan Eckert, but later changed her last name to

Eckchum, in an effort to adopt part of Mr. Ketchum's last name. *Id*. at 50. Understandably, the fact that Appellant adopted Mr. Ketchum's last name disturbed and frightened him. *Id*.

**D. Testimony from Mrs. Andrea Ketchum at Hearing on Final Protective Order:**

The entirety of this evidence was corroborated by Mr. Ketchum's wife, Andrea Ketchum. The couple had been together for two years. *Id.* at 54. Andrea Ketchum testified that Appellant would continually follow the family. *Id*. She told the court that on January 23, 2014, after a birthday celebration, Appellant appeared in a parking lot near their truck and made a signal with her hand in the shape of a gun and threatened Mr. Ketchum that he would be sorry. *Id*. at 55. According to Andrea Ketchum, during the same incident, when told to stay away from the family, Appellant "returned by staring at us and smiling and said 'I never knew that you had a family,' and just smiling really creepily." *Id*. The incident escalated to the point where their daughter had a panic attack. *Id*.

Andrea Ketchum is in constant fear for her step-daughter's safety, always informing the local police at concerts to keep an eye on family members. *Id.* at 56. Their daughter is no longer allowed to walk around town alone, for fear of what Appellant might do. *Id*. Andrea Ketchum corroborated that Appellant has come onto their property and taken pictures of their children and grandchildren. *Id*. At

concerts, she testified that "everywhere we stand she [Appellant] appears. Behind poles. If Rose [step-daughter] and I go to the restroom we'll come out and she's following. She's looking. She's taking photographs and just even down to where we put Rose in the truck and she'll be outside surrounding the truck […] if Rose goes across the street she'll follow her across the street. If I have concern I put Rose in the truck and lock the doors and listen to the radio and I'll look outside and Ms. Eckchum will be outside the truck." *Id.* at 58-59, 65.

### E. Testimony from Appellant at Hearing on Final Protective Order:

Throughout Appellant's testimony, she attempted to explain her disturbing behavior by claiming she was an amateur musician and reporter who covered many of Mr. Ketchum's concerts. *Id.* at 68. She claimed she met Mr. Ketchum at three separate concerts beginning in 1994 while working as a staff member of the Montrose Daily Press and covering the events. *Id.* at 67-69, 76.

Appellant testified that her birth name was Billy Suzanne Barnes. *Id.* at 76. She later changed her name to Suzanna Eckhart when she married her ex-husband. When asked how she came by the name of Eckchum—which mirrored Mr. Ketchum's name—she attempted to explain the following: "Well, Eck, the first part E-C-K is part of my married name. I kept that for my son's sake. Chum means friend. Apparently it is the end of Mr. Ketchum's name but it's also a name myself. I put it together Eckchum which means like a life force friend." *Id.* at 77.

Appellant described herself as an amateur guitarist who was inspired by Mr. Ketchum to start writing music. *Id*. at 78. She was not a professional musician, however, and was not making a living off of playing music. *Id*. at 79. She claims she was both playing music as well as writing articles for various magazines and newspapers while living in Tennessee, but worked at Shoney's as a waitress to earn money. *Id*. at 101.

She claimed that in 1997, she discovered Mr. Ketchum's address in a magazine and wanted to see his home. *Id*. at 80. This is the same date local police stopped her. *Id*. at 81. According to Appellant, she was "four or five houses away from Mr. Ketchum's." *Id*. at 81. The police showed her several photos and told her that she had been sending love letters to Mr. Ketchum. *Id*. She replied that she sent the items only to Mr. Ketchum's management office. *Id*. According to Appellant, no protective order was issued, and police only informed her about "stalking" and told her to leave Mr. Ketchum alone. *Id*. She stated that she was attempting to get a book published but acknowledged that she "received a lot of problems from the management people. A lot of damages that I was finding out later that they were accusing me of stalking." *Id*. at 83. In her testimony, Appellant did not address the fact that Mr. Ketchum found her going through his mail in addition to standing in his yard.

Appellant stated that she went to Austin sometime in 1997 to work on songs because Austin was the "live music capital of the world." *Id*. She performed at cafes and bars, and most of the time on "freebee night" without pay. *Id*. at 84. During that time she also wrote articles for small local papers. *Id*.

Appellant testified that she moved to Fischer Store Road in August, 2013, three months before Mr. Ketchum moved to the location. *Id*. at 86. She claimed that due to a hip replacement, she was in a hospital and rehabilitation center from approximately January 15, 2014 until February 3, 2014. *Id*. at 87. After that time, she moved in with a friend until May, 2014. *Id*. at 88. During this time, she claimed she was not staying on Fischer Store Road. *Id*. She denied ever taking pictures of Mr. Ketchum's home or his family. *Id*. at 90. When asked if she ever took pictures of his family, she stated "No, I did not. Never." *Id*.

She admitted that she went to a show of his called "Wag Fest," but stated that, at the time, she was a radio host for Wimberley Valley Radio and only went to the event in order to prepare for her radio program. *Id*. The manager of the station, Mrs. Raybuck, later testified that Wimberley Valley Radio is not actually a broadcast radio station, that it is only accessible on-line. *Id*. at 103. Also, Appellant was not a paid employee, only a volunteer. *Id*. at 110. In fact, Appellant herself approached the station in an attempt to start a show where she would be able to interview musicians, and the station agreed. *Id*. at 105.

11

Appellant remembered encountering Mr. Ketchum on January 12, 2014, at Gruene Hall while he was there with his friends and family. *Id.* at 90. She claimed she was there in order to listen to music, then left the building to find coffee down the street. *Id.* at 91. She decided to walk because she didn't want to lose her handicap parking spot. *Id.* at 92. She stated that when she was on the sidewalk she saw Mr. Ketchum and heard him cursing. *Id.* She claimed Mr. Ketchum was blocking her path and telling her to leave him alone. *Id.* She stated "each time I would say to Hal would you move I'm getting coffee[,] he said, 'no, you get. You get back where you came.' I said I'm getting coffee. Please move." *Id.* at 93. She then left the area and went to a police officer standing by Gruene Hall to inform him of what had happened. No action was taken by the officer. *Id.*

Appellant stated she was never at Gruene Hall on either January 23, 2015 or March 21. She also denied being at Luckenbach on March 30 or April 12, when Appellant was playing, though admitted having been there on a different date. *Id.* at 94. She did not recall weather she was at Fischer Store on May 20. *Id.* at 95. Throughout Appellant's testimony, she attempted to dispute the dates of the various musical events Mr. Ketchum performed at and noted in his original affidavit for protective order. CR 8-9 (listing at least twelve recent and specific dates and places Appellant has stalked him). She also attempted to justify her presence at certain events by saying she was there to do interviews, and not to

12

harass or stalk Mr. Ketchum. *Id.* at 95-98. She did not remember following Mr. Ketchum or his family to Ace Hardware Store on November 20. *Id.* at 98. She denied ever stalking him or threatening him with her hand in the shape of a gun. *Id.* at 100. She stated Mr. Ketchum never asked her to leave him alone, except during the incident at Gruene Hall, but admits she was aware of the stalking issue and even stated that Dennis Hubbard, who owned another establishment called Fischer Cantina near Mr. Ketchum's property, had told her that she was not welcome at his establishment because of the stalking problems. *Id.* at 39, 102.

**E. Testimony from Kathy Hudson at Hearing on Final Protective Order:**

Appellant called Ms. Kathy Hudson to testify on her behalf. *Id.* at 111. Ms. Hudson also resided in Wimberley, Texas. *Id.* She stated she was a friend of Appellant's, and she was not certain when Appellant moved to Wimberley, Texas, though she believed it was approximately two years prior. *Id.* at 112. Ms. Hudson stated that she and her boyfriend "Snake" let Appellant live with them sometime in December or January of 2013. *Id.* She claimed that she and her boyfriend later found Appellant a place to live on Fischer Store Road sometime in August, 2013. *Id.* Because of health issues, Appellant then moved back in with Ms. Hudson in January, 2014 until May, 2014. *Id.* She claimed that during Appellant's brief rehabilitation, she did not appear to be mobile or able to "follow" anyone. *Id.* at 114. The only occasion on which Ms. Hudson observed Appellant in Mr.

13

Ketchum's presence was at a place called Cypress Creek. *Id*. at 114-115. There, she saw Mr. Ketchum eating with friends and "he had two people from the sheriff's department come and he was pointing and talking to them I don't know what about…" *Id*.

**F. Testimony from Patricia Holmes at Hearing on Final Protective Order:**

Appellant also called Ms. Patricia Holmes to testify regarding the altercation that occurred between Appellant and Mr. Ketchum. *Id*. at 71. She did not state where the incident happened specifically or on what date it occurred, but said she heard a man, presumably Mr. Ketchum, yelling and cursing at Appellant in a driveway near her store. *Id*. at 71-72. She said that Appellant appeared calm and that Mr. Ketchum was upset and angry. *Id*. Another woman, Mrs. Ketchum, was pulling him back away from Appellant when he lunged, telling him to get in the car. *Id*. Mr. Ketchum's daughter was also there. After the incident she was upset and crying and ran into Ms. Holms' store, worried that her father was going to go to jail. *Id*. Ms. Holms did not know what instigated the altercation. *Id*. at 74.

**G. Testimony from Susan Raybuck at Hearing on Final Protective Order:**

Finally, Appellant called Ms. Susan Raybuck to the stand. Ms. Raybuyck owned and operated the Wimberley Valley Radio. As stated earlier, she informed the Court that Appellant was not an actual employee, and that the station did not

have an FCC Broadcast license. *Id*. at 103. On one occasion, she and Appellant attended the benefit event called "Eppy the Clown," presumably the same event when the new hospital was opened in New Braunfels. *Id*. at 107. She did not observe anything specific with regards to Appellant's mannerisms towards Mr. Ketchum while he was playing. *Id*. She was not specifically aware of Appellant's stalking problem but stated, "she [Appellant] told me at some point that he [Mr. Ketchum] had got mad at her, but she never explained in any kind of detail and I didn't ask…" *Id*. at 108. Also, on December 17, she received a phone call from a woman identifying herself as Andrea Ketchum, Mr. Ketchum's wife, informing the station that Mr. Ketchum was going to be filing a protective order against Appellant. *Id*. Mrs. Ketchum told her that she believed Appellant was using her position at the station to get close to Mr. Ketchum. *Id*.

### H. Final Order

After listening to all of the testimony, the trial court requested the State's proposed final order. *Id*. at 116. Attorney for Mr. Ketchum tendered to the court a copy of its proposed order, and stated on record: "Specifically we're requesting a lifetime protective order." *Id*. Appellant requested that the order be denied or, in the alternative, that reasonable restraints be put in place. *Id*. at 117. At no time did she make any specific objections regarding the duration of the order or the prohibited distance. *See generally Id*. at 116-21. The Court granted the order,

finding "reasonable grounds" to believe that the applicant was a victim of stalking. *Id*. at 117. The Court added: "I'm looking at 7(a) .05. One requires the Court to order the alleged offender to take action as specified by the Court, the Court attorneys, if necessary, appropriate to prevent or reduce the likelihood of future harm to the applicant or a member of the applicant's family or household. So in that regard I think we need to be more specific…" *Id*. the Court ordered a lifetime protective order and ordered the Appellant to:

1. Not go to any venue where Mr. Ketchum was performing at least three (3) hours before and after the performance, as well as during performances;
2. Stay one thousand yards (1,000) from Mr. Ketchum or his family or any member of his household, including his daughter's school;
3. Not take pictures of Mr. Ketchum, his family, or members of his household;
4. Not communicate directly or indirectly with Mr. Ketchum or any member of his household;
5. Not engage in any conduct toward Mr. Ketchum including following him or his family or member of his household that was reasonably likely to harass, annoy, harm, abuse, torment, or embarrass them;
6. Not possess a firearm.

The Court noted: "I understand that there's been performances at places like Gruene Hall and other locations… I can't anticipate where he [Mr. Ketchum] may or may not perform in the future, so that would be any performance venue. I think that's pretty simple to find out. Look in the newspaper." *Id*. at 119. The Final Stalking Protective Order was signed on January 22, 2015.

16

## I. Hearing on Motion for New Trial:

On February 19, 2015, Appellant filed a motion for new trial. On April 2, 2015, the Court held a hearing on Appellant's motion for new trial. 3 RR 1. Appellant's motion stated vaguely: "I, Susan Eckchum, wish to appeal the STALKING PROTECTIVE ORDER to the THIRD COURT OF APPEALS and ask for a new trial based on the facts does not support the order as of this date 2/11/2015." CR 26. No specific claims were made in the motion. At the Hearing, held more than 30 days after Appellant's motion for new trial was filed, Appellant raised only two issues. Appellant argued that the State failed to prove the "crime of stalking," and that the evidence was legally and factually insufficient to support the trial court's findings. 3 RR 4-5. Appellant then suggested that there might be constitutional issues regarding the distance Appellant was allowed to go near Mr. Ketchum. *Id.* at 9-10. Neither of these issues were raised during the original hearing or in her motion for new trial. The Court denied the motion, and addressed the distance issue by amending the order and decreasing the stay-away provisions from 1,000 **yards** to 1,000 **feet**. 3 Supp. SCR 8 (emphasis added).

# SUMMARY OF THE ARGUMENT

## 1.

Appellant contends that the evidence submitted at the Hearing on the Final Protective Order was not legally or factually sufficient to support the granting of a Stalking Protective Order. Appellant claims that there was no evidence to support that a reasonable person would have feared death or bodily injury in this situation.

However, legal and factual sufficiency existed to support the trial court's order. The record shows that Mr. Ketchum was stalked for over a decade and on more than one occasion. The trial court, based on the totality of the evidence, found "reasonable grounds" under the applicable criminal statute to believe that Mr. Ketchum was a victim of stalking. During testimony, Appellant repeatedly acknowledged that she had been told to stay away from Mr. Ketchum. Her behavior continued despite this knowledge and after she threatened him and his family "that he would be sorry." Under the applicable statute, stalking occurs not only when there has been a threat of bodily injury or death, but also if one knowingly engages in conduct that would harass, annoy, alarm, abuse, torment, embarrass, or offend a reasonable person. The evidence clearly shows that Appellant's behavior resulted in Mr. Ketchum reasonably feeling all of the above.

**2.**

Appellant contends, for the first time on appeal, that the statutory framework is unconstitutional and that the trial court's lifetime protective order prohibits Appellant's free speech under the First Amendment and ability to take photos. Appellant believes that it is unreasonable to require Appellant—who sometimes volunteers to take photos for newspapers—to be aware of her surroundings and the subject matter of her photos before she takes them.

Appellant failed to preserve this argument for appeal. In addition, the restrictions placed on Appellant are narrowly constructed, applying only to photos taken of Appellant and members of his family, not the general public. The restrictions are the result of Appellant's invasion of Mr. Ketchum's privacy and her stalking behavior. Also, Appellant only risks criminal charges for violating this order is she "knowingly" or "intentionally" violates it, thus alleviating the problem of her being charged with a crime for accidentally running into him on the street or accidentally taking photos of him or his children who happen to be in the background.

**3.**

Appellant contends that the State relied on false testimony which deprived Appellant of her due process, and that the trial court granted a stalking protective

order when the State initially applied for a family violence protective order. Appellant believes she was accused of a criminal offense and is now subject to an order that restricts her constitutional liberty.

Appellant failed to preserve this argument for appeal. Additionally, there was no false testimony offered at the trial court hearing. Appellant offers no evidence in support of her theory. Mr. Ketchum was subjected to a full and thorough cross-examination regarding the facts and events as he knew them. The trial court had discretion to weigh the evidence or lack of evidence, as well as all testimony including the credibility of witnesses. In addition, from the beginning, the State clearly filed a stalking protective order, which was even acknowledged by Appellant's attorney during the hearing. No issues regarding due process or notice were ever brought up during the hearing, and Appellant's attorney clearly understood that the State was seeking a stalking protective order.

**4.**

Appellant alleges that the State originally filed a family violence protective order, and that the trial court erred in granting a lifetime stalking protective order not specifically requested by the State.

Appellant failed to preserve this argument for appeal. In addition, the original protective was in fact a stalking protective order, and proper notice was

given to Appellant regarding the order. Appellant's attorney acknowledged repeatedly that she understood the State was pursuing a stalking protective order. At the final hearing, the State requested that the stalking protective order be put in place for a lifetime duration. In accordance with the trial court's authority, the lifetime stalking protective order was granted.

## 5.

Appellant alleges the trial court exclude testimony relevant to Mr. Ketchum's allegations and erred in concluding that the order was necessary.

Appellant has failed to preserve this complaint for appeal by failing to file a formal bill of exception. In addition, trial courts retain great latitude in imposing reasonable limitations on cross-examination, and the trial court heard sufficient evidence of stalking and threats of bodily injury or death to conclude that a lifetime stalking protective was necessary.

## **STANDARD OF REVIEW**

### **Legal and Factual Sufficiency**

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to

prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). The Court considers evidence in light most favorable to the finding and indulges every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). If more than a scintilla of evidence exists, it is legally sufficient and the holding will be upheld. *Lozano v. Lozano,* 52 S.W.3d 141, 145 (Tex.2001). To rise above a scintilla, the evidence offered to prove a vital fact must do more than create a mere suspicion of its existence; it must rise to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

In reviewing a factual sufficiency challenge, the Court weighs all of the evidence in the record. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). The Court will overturn the finding only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.* Additionally, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). The Court will not substitute its judgment for that of the trial court merely because it might reach a different conclusion. *Id.* at 616. When there are no findings of facts and conclusions of law, all facts necessary to support the

judgment and supported by the evidence are implied. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

## Preservation of Error

A constitutional complaint must be made to the trial court by a timely request, objection, or motion. *See Lancaster v. Lancaster*, 01-12-00909-CV, 2013 WL 3243387, at \*1 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.) (not designated ofr publication) (citing Tex. R. App. P. 33.1(a)(1); *Mansions in the Forest L.P. v. Montgomery Cnty.*, 365 S.W.3d 314, 317 (Tex. 2012); *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003)); *Valdez v. Valdez*, 930 S.W.2d 725, 728 (Tex. App.—Houston [1st Dist.] 1996, no writ)).

In motions for new trial, grounds of objections must be specific enough to eliminate speculation and allow the trial court to understand what is being alleged. Tex. R. Civ. P. 322; *see also Townsend v. Collard*, 575 S.W.2d 422, 423-24 (Tex. Civ. App.—Fort Worth 1978, no writ). Arguments are waived as to matters that would not otherwise appear in the record unless appellant files a formal bill of exception. *Lancaster*, 01-12-00909-CV, 2013 WL 3243387 \*1 (citing Tex. R. App. P. 33.2(e)(1)).

**Protected Speech under the First Amendment**

The Federal Constitution prohibits laws that abridge the freedom of speech. U.S. Const. amend I. However, communication may be prohibited when "substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971). Conduct is unlikely to enjoy any protection where the actor intends the place the recipient in fear of death or bodily injury. *Ploeger v. State*, 189 S.W.3d 812 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Long v. State*, 931S.W.2d 285, 293 (Tex. Crim. App. 1996); *Clements v. State*, 19 S.W.3d 442, 451 (Tex. App.—Houston [1st Dist.] 2000, no pet.)).

# <u>ARGUMENT</u>

## 1. Evidence is Legally and Factually Sufficient to Prove Stalking

Appellant's first argument centers around the belief that the State failed show that Mr. Ketchum was reasonably placed in fear of bodily injury or death, and that Appellant knew her conduct would cause those fears. The pertinent stalking statute reads:

> A person commits an offense if the person, **on more than one occasion and pursuant to the same scheme or course of conduct** that is directed specifically at another person, **knowingly engages in conduct that**:

24

(1) **constitutes an offense under Section 42.07, or** that the actor knows or reasonably should know the other person will regard as threatening:

(A) **bodily injury or death for the other person**;

(B) **bodily injury or death for a member of the other person's family** or household or for an individual with whom the other person has a dating relationship; or

(C) that an offense will be committed against the other person's property;

(2) **causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and**

(3) **would cause a reasonable person to**:

(A) **fear bodily injury or death** for himself or herself;

(B) **fear bodily injury or death for a member of the person's family or household** or for an individual with whom the person has a dating relationship;

(C) **fear that an offense will be committed against the person's property; or**

(D) **feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended**.

Tex. Pen. Code Ann. § 42.072 (emphasis added).

The record shows that for over a decade, and on multiple occasions, Mr. Ketchum was subjected to Appellant's explicit and implicit threats directed at himself as well as nearly every member of his family. Appellant was made aware that her conduct was unwelcome and was told on many occasions by many people to stop stalking Mr. Ketchum. The record, as well as every case cited by Appellant

25

in her brief, supports the trial court's finding that reasonable grounds existed to show stalking had occurred.

### a) Appellant knew or should have known her acts would place Mr. Ketchum or his family in fear of bodily injury or death.

Under the statute, "a  person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* at § 6.03(b). Proof of a culpable mental state often depends on circumstantial evidence and "may be inferred from any facts tending to prove its existence, including the acts, words, and conduct of the accused." *Hart v. State,* 89 S.W.3d 61, 64 (Tex.Crim.App.2002).

Appellant cites several cases that hold that the knowledge requirement is met even when the accused is warned by third parties about her conduct.  *See, e.g. McGowan v. State*, 375 S.W.3d 585, 590, 591, (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (indicating warnings from police officers and third parties gave defendant knowledge that his conduct would be considered threatening bodily injury to victim, and the offense of stalking contemplates the entire course of defendant's conduct); *Allen v. State*, 218 S.W.3d 905, 909 (Tex. App.—Beaumont 207, no pet.) (Finding jury could rationally conclude that victim's violence toward

26

defendant were a defensive response to defendant's stalking, and that defendant had knowledge he was placing victim in fear after police warned him to stay away).

Importantly, Appellant also cites *Teague v. State*, which holds that there is no requirement that the State produce evidence of prior protective orders, actual physical harm, direct threats of physical harm, or use of a weapon in order prove that defendant should have reasonably known that her conduct placed victim in fear of bodily injury. 06-14-00053-CR, 2015 WL 2236642, at *11 (Tex, App.—Texarkana May 13, 2015, no. pet. h.); *see also Hart*, 89 S.W.3d at 64 (holding that 100 years of Texas law has established that direct evidence of the requisite intent is not required and that a jury may infer mental state from any facts which tend to prove its existence, including the acts, words, and conduct of the accused).

Contrary to Appellant's argument, it is not necessary that the State show precisely what Appellant was thinking while she was stalking Mr. Ketchum. The established case law shows that implied threats are just as real as direct threats, and can take many different forms that serve to put the perpetrator on notice of his or her conduct. *See, e.g., Hansen v. State*, 224 S.W.3d 325, 329 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that, while no direct evidence of physical threats existed, defendant's behavior in sneaking into victim's home and leaving behind paintings and love poems as a show of affection, and returning to the

27

property after victim's mother told him to stay away, would reasonably cause victim and her mother to fear bodily injury.); *Ploeger,* 189 S.W.3d 799, 810 (finding that appellant knew or reasonably should have known victim would perceive his conduct as threatening bodily injury due to victim's personal manifestations of fear and being told by third parties to stop his behavior).

In *Ploeger*, no direct threats were made, only acts that could be construed as affectionate pursuits, including sending love letters and cards to his victim. *Id*. *Ploeger* notes that the frequency, escalation, content, and unsolicited nature of the perpetrator's behavior would have caused a reasonable person to fear bodily injury. *Id*. Though the perpetrator never physically harmed or overtly threatened harm, the court noted that an officer who testified in the case stated he "'could understand where [the victim] was coming from, given [the perpetrator's] conduct.'" *Id*. The officer was concerned about the perpetrator's behavior because "[i]t just wasn't normal." *Id*. It is an implicit feeling or understanding that a victim in that kind of situation—considering the entire scope of events—does not know what to expect from the perpetrator, and may still fear physical harm though nothing overtly threatening has been said or done.

In the present case, Appellant was told by many people throughout the years to leave Mr. Ketchum alone. Mr. Ketchum testified that Appellant had been constantly told not to go anywhere near him or his family. 2RR33. At nearly every

28

concert he performed, he told police to keep her away. *Id*. at 15. Appellant testified that while she still lived in Tennessee she was made aware by Mr. Ketchum's management team that she was stalking Mr. Ketchum. *Id*. at 83. There is no dispute that Appellant was told by Nashville police to leave Mr. Ketchum alone. Appellant herself stated that police stopped her on the street, informed her that she had been taking pictures of Mr. Ketchum and sending him love letters, discussed the offense of stalking with her, and asked her to leave him alone. *Id*. at 81. In her testimony, she said she disagreed with the officers, but clearly states she was made aware of the stalking problem and asked to stop. *Id.*

When she was discovered going through his mailbox in Nashville, Mr. Ketchum yelled at her and she promptly left the scene. *Id.* at 13. Though he did not testify that he specifically told her to leave, she appeared to understand what he was communicating when she physically left his property. Her actions were enough for the trial court to implicitly find that she was aware she was not welcome around him and that she was stalking him. Appellant also admitted she was barred from a local business in Texas because the owner told her there were "ill feelings" between she and Mr. Ketchum. *Id.* at 103. Ms. Susan Raybuck stated on the stand that Appellant told her Mr. Ketchum "had gotten mad" at her at one point. *Id*. at 108. Additionally, Mr. Ketchum again told Appellant to leave him alone when she followed him at a birthday gathering in 2014. *Id.* at 16.

29

Appellant was told by Mr. Ketchum, his friends, and police to leave Mr. Ketchum alone. Appellant acknowledged she understood, both directly though her statements and indirectly through her actions, but continued to stalk Mr. Ketchum despite this knowledge. The State's evidence presented to the trial court was both legally and factually sufficient.

b) **All of the evidence shows Appellant acted in a "common scheme" directed at Mr. Ketchum and his family, and Appellant's statements— "Mess with me and you'll be sorry"—and her "gun gesture," as well as all implicit threats made over the years, are sufficient to show Mr. Ketchum reasonably feared bodily injury or death for himself or his family.**

Again, when determining whether a reasonable person would fear bodily injury or death, it is important to understand the entire history between the parties. *See Ploeger* 189 S.W.3d 811 (finding a jury rationally could have found that the frequency, escalation, content, and unsolicited nature of appellant's conduct, as well as display of at least some anger when others disagreed with him, would cause a reasonable person to fear bodily injury or death). The courts frequently look at how a perpetrator's actions have caused the victim to change his or her behavior in response to the threats. *Id*. at 809 (relying on evidence of victim's manifestation of fear over three years and her avoidance of going to her church and gym because of stalker's actions to find reasonable fear existed). The Court in *Ploeger* stated: "contrary to the suggestions in his brief, [victim] testified expressly that she feared that appellant would cause her death or bodily injury because of his behavior. This

30

testimony sufficed to support the jury's implicit finding of this element." *Id.* at 810. *See also Teague*, 2015 WL 2236642, at *8, *11. (noting how victim began sleeping with a chair wedged under her door at night because she was fearful of stalker, despite stalker's claim that no threats were made and that her fear was a fabricated "'theory emanating from an irrationally scared individual.'"). A victim's aggressive response to a perpetrator's threat may appear inconsistent at first. However, when considering the pattern of stalking, these actions are often a "defensive response" to the stalker's behavior. *See Allen* 218 S.W.3d 908, 909 (holding that a jury could rationally construe victim's physical violence toward stalker as a defensive response, even when a witness for appellant controverted victim's account that she acted in self-defense).

Some of Appellant's actions, taken individually and alone, may not seem extraordinary, but her conduct throughout the preceding decades would cause any rational person, including Mr. Ketchum, to fear bodily injury or death. This is especially so in the context of Appellant's escalation of the stalking when she followed Mr. Ketchum's family and directly threatened him after he asked her to leave him alone by using her hand in the shape of a gun and telling him that if he messed with her he would be sorry. 2 RR 17. Mrs. Ketchum was also a witness to this threat. *Id.* at 55. Appellant rationalizes her behavior by characterizing it as a conditional threat only, though Mrs. Ketchum elaborated that Appellant, when told

31

to stay away from the family, also "smiled really creepily," and told Mr. Ketchum that she didn't know he had a family. These two threats are both implicit as well as explicit threats, and can be seen as constituting two separate threats of bodily injury, the one being Appellant's hand motion of a gun while saying Mr. Ketchum would be sorry, and the second, made moments apart, implicitly threatening his family while smiling. *See Hutton v. State*, 313 S.W.3d 902, 908, 909 (Tex. App.— Amarillo 2010, pet. ref'd) (holding that the stalking statute's requirement that events occur on more than one occasion does not require the elapse of a particular or minimum interval of time). In *Hutton*, the threats came in the form of defendant merely following two female joggers through the streets. No prior relationship or verbal threats had ever been made, and the Court found that the evidence of stalking was neither so weak nor so contravened by contrary evidence as to be clearly wrong or manifestly unjust. *Id*. at 909. The threat and "gun" incident involving Mr. Ketchum and Appellant occurred in 2014, after many years of Mr. Ketchum being subjected to Appellant's frightening behavior. Moreover, Mr. Ketchum documented ten separate stalking incidents that occurred after the "gun" threat. *See* CR 8-9. Whether Appellant was mentally ill or not is unknown, but not knowing what a stalker is capable of doing, or when a stalker or obsessed fan has reached a breaking point, is always a concern for victims of stalking.

32

To the extent Appellant argues that the testimony of Mr. Ketchum and his wife during "gun" threat incident were not credible or controverted by a witness who heard only a portion of the altercation, it is clear from the case law that the trial judge is the sole determiner of witness credibility. *See e.g., McGowan*, 375 S.W.3d 590, (holding that despite appellant's assertions that complainant's testimony was contradictory, inconsistent, speculative, and embellished in regards to whether she felt rational fear of bodily injury, the jury was the exclusive judge of the credibility of witnesses and the weight to be given their testimony); *GTE Mobilnet,* 61 S.W.3d 615-16 (holding that the trier of fact is the sole judge of witness credibility and the weight to be given their testimony).

Patricia Holmes, a witness to the final moments of the incident, testified she saw Mrs. Ketchum hold back Mr. Ketchum when he appeared to "kind of lunge" at Appellant. 2 RR 71—72. She did not see or hear what caused Mr. Ketchum's reaction. 2 RR 74. At no point in her testimony did she say Mr. Ketchum instigated the event. Mr. Ketchum admitted that he indeed "went off" on Appellant, but only *after* she threatened him and his family. *Id*. at 17. The fact that he became angry at Appellant does not controvert his assertion that he feared for himself or his family. Nor was his reaction unreasonable, considering the fact that he is both a husband and father confronted with the ongoing threats to himself, his wife, and his children. One would not expect him to run in fear under such circumstances,

33

leaving his family behind. Instead of fleeing, Mr. Ketchum's defensive reaction was to confront Appellant and protect his family, as any rational husband or father would do.

In addition to the explicit and implicit threats made by Appellant at the birthday gathering in 2014, Mr. Ketchum testified to numerous incidents that caused him bodily fear over the years. The first time he met Appellant in 1994 he was concerned because she stood at the back of an autograph line, which indicated to him that she wanted to monopolize his attention. 2 RR 12. Standing alone, this occurrence may seem innocuous, but it marked the beginning of Appellant's obsession with Mr. Ketchum's celebrity. Events became more disturbing as time went on. As stated previously, Mr. Ketchum saw Appellant standing in his yard and going through his mail. *Id.* at 13. She would show up at his children's schools and follow them at the grocery store. *Id*. It got to the point where Mr. Ketchum had to alter his own behavior and lifestyle, informing police and security at the events he played to watch out for her and make sure to protect his family. *Id*. at 14, 56. He called police in Nashville about the stalking and his concerns. *Id.* at 13. He also called Comal County Sheriff's Office about Appellant's behavior. *Id.* at 47. On several occasions, when Appellant followed his wife into the restroom at concerts he was playing, he was so frightened he stopped playing and went into the women's bathroom to retrieve her. *Id.* at 13.

34

This has negatively affected his entire life and career. He described her behavior as a "cat and mouse" game. *Id*. at 13. He stated: "I constantly now look out my window, okay, waiting for the next drive-by. Sounds kind of paranoid, but it's come to that." *Id*. at 19, 20. Mrs. Ketchum testified that she always watches out for Appellant at concerts, and often brings friends and family along in order to keep an eye on Appellant. *Id*. at 56. Their entire family has changed their behavior and is forced to be vigilant at all times. *Id*. Appellant has come onto his property numerous times, causing his family fear. *Id.* at 12, 36, 41, 56. She appears unexpectedly at his daughter's school in Wimberley. *Id*. at 38, 51-52. Appellant has no children that attend the Katherine Ann Porter School, yet has followed the family and his daughter to that location on more than one occasion. *Id*. at 51-52. She has also taken pictures of the family and followed them even after making the "gun" threat." CR 8-9. She follows his daughter through town and Mr. Ketchum and his wife are forced to restrict where their daughter can go, preventing her from walking around town or at venues alone. *Id*. at 18, 56, 58-59. Appellant has surrounded Mr. Ketchum's truck while his daughter was inside, and his wife was concerned to the point where she locked the vehicle doors. *Id*. at 59. These reactions are the result of a legitimate and reasonable fear of bodily injury or death that escalated at the birthday celebration in 2014 when Appellant threatened Mr. Ketchum and his family's life. He has exhibited extraordinary restraint over the

35

years in the face of Appellant's relentless pursuit of his attention. She has even gone to the extreme of adopting his last name. *Id.* at 50, 76-77.

Appellant argues that all of these acts fail to show a common scheme of threatening conduct, believing Appellant "works" in the same industry as Mr. Ketchum and that the interactions are merely "chance encounters." The evidence is clear, Appellant has been stalking Mr. Ketchum for over sixteen years, at least since 1997 when he found her standing in his front yard in Tennessee. *Id.* at 24. This is a sustained pattern of behavior, not a handful of coincidental run-ins. Appellant is not a professional musician, and while stalking Mr. Ketchum in Tennessee she worked as waitress at Shoney's. *Id.* at 101. At the same time as alleging that she is a musician, Appellant alleges that she is also a reporter, and that she sometimes appears at Mr. Ketchum's concerts and takes pictures of his entire family and his home because it is a part of her job. This is not consistent with the sustained pattern of her behavior, and it fails to explain why she continually follows his children to school or though town, why she went through his mail, or why after being stopped by police in Nashville and asked to leave Mr. Ketchum alone she continued the stalking.

Ms. Susan Raybuck, station owner of Wimberley Valley Radio where Appellant volunteered, testified that Appellant herself organized and pitched a show to the station called Texas Hill Country Performers, and Appellant picked the

36

musicians to invite on the show and did all of the research for the interviews. *Id.* at 105-106. The shows were Appellant's idea, and she made the conscious choice to go to the venues where Mr. Ketchum was playing even though she had been told to leave him alone. At a benefit concert called Eppy the Clown, where Mr. Ketchum was performing, Appellant volunteered to go to the venue and take pictures. *Id.* at 98, 99. Mrs. Ketchum put it best when she told Ms. Raybuck that Appellant "was using her position to get close to Hal [Ketchum]). *Id.* at 108. Mr. Ketchum expressly testified that he was "absolutely" in fear for his safety. *Id.* at 19-20. He stated: "I lay in bed some nights and think there might be a bullet that will come through my house. I'm frightened for my life, honestly." *Id.* He described Appellant's behavior as being very different from the average fan or reporter, and told the trial court that he constantly looks out his window wondering if he will be the victim of a drive-by. *Id.* He acknowledges that this may sound paranoid, but insists that she has gotten out of hand. *Id.*

Additionally, Appellant relies heavily on *Franklin v. Benton-Elam* throughout her argument. In *Franklin*, the applicant had been having an adulterous affair with respondent's husband for three years. 06-13-00126-CV, 2014 WL 1722165, at *1 (Tex. App.—Texarkana Apr. 30, 2014, no pet.)(not designated for publication). Applicant testified that on two separate occasions, respondent initiated altercations at various public locations. *Id.* at *2-*3. However, third party

37

witness contradicted applicant's testimony, specifically claiming that applicant initiated the conflict. *Id*. A third and final incident occurred at a Dollar General store, where the two women passed by each other near the entrance door. *Id*. at *3. Witnesses for both sides indicated that the other party instigated the physical fight. *Id*. at *3-*4. The trial court subsequently denied applicant's protective order, and in its finding of facts wrote that "'although [applicant] testified that threats were made by physical harm, the testimony of other witnesses did not support this testimony. The Court did not find [applicant's] testimony credible." Id. at *6. The trial court described the physical fight as mutual combat. *Id*. at *6-*7. On appeal, The Court of Appeals of Texarkana found that the trial court "clearly dismissed applicant's testimony and found that no testimony from others established an active threat. The trial court refused to characterize [applicant] as a victim," and made specific conclusions of law characterizing the two parties as mutual combatants. *Id*. at *8. The Texarkana Court repeated that that the trial judge "is the sole judge of the weight and credibility of the evidence and is entitled to resolve any conflicts in the evidence and to choose which testimony to believe." *Id.* The Texarkana Court found that the trial judge's ruling was not arbitrary or unreasonable, and refused to find that the trial court abused its discretion. *Id.*

In the present case, Applicant has been stalking Mr. Ketchum for substantially longer than three years. 2 RR 19. Since at least 1997, she has been

shadowing Mr. Ketchum and his family across different states and multiple cities where he has lived and performed, including Nashville, Wimberley, Gruene, and Luckenbach. *Id*. at 18. In 2014 alone she followed him to at least six different shows. *Id.* Again, these are not "chance encounters" in one small town during a relatively short period of time. Contrary to Appellant's assertion, Ms. Patricia Holmes did not state that Mr. Ketchum in any way instigated the incident at the birthday gathering in 2014. There has never been an allegation that Mr. Ketchum has instigated or caused physical violence toward Applicant. Considering the circumstances, he has exhibited remarkable restraint. His reaction toward Appellant has been wholly reasonable and justified.

As in *Franklin*, the trial court in this case was free to believe or disbelieve whatever evidence was presented, and to determine the credibility of the witnesses. Appellant failed to request findings of fact or conclusions of law. In light of Appellant's entire history of stalking Mr. Ketchum and his family, his fear of bodily injury or death is not surprising or unreasonable. The evidence establishes that there have been many explicit as well as implicit threats of bodily injury or death made over the years. For these reasons, sufficient legal and factual evidence exists supporting the trial court's granting of the lifetime stalking protective order.

39

## 2. The Stalking Protective Order restrictions placed on Appellant in no way criminalize her protected speech, and Appellant has failed to preserve this argument for appeal.

Appellant has waved any First Amendment argument on appeal. For preservation, the record must show that Appellant's complaint was made to the trial court by a timely request, objection, or motion. *Lancaster* 2013 WL 3243387, at *1 (citing Tex. R. App. P. 33.1(a)(1); *Mansions* 365 S.W.3d 317). The rule also applies to constitutional claims. *Id.* (citing *In re L.M.I.*, 119 S.W.3d 711 (noting both the Texas Supreme Court and United States Supreme Court have held that constitutional claims must be raised before the trial court to preserve error)). In motions for new trial, grounds of objections cannot be couched in general terms, including assertions that "the verdict of the jury is contrary to the law." Tex. R. Civ. P. 322; *see also Townsend* 575 S.W.2d 423-24 (noting rule 322 requires that complaints in a motion for new trial be made with sufficient specificity to enable the trial judge to clearly understand what is alleged as error; the judge should not have to speculate, but should be directed to the matters upon which he is called to rule).

Appellant's original motion for new trial stated: "I, Susan Eckchum, wish to appeal the STALKING PROTECTIVE ORDER to the THIRD COURT OF APPEALS and ask for a new trial based on the facts does not support the order as of this date 2/11/2015." CR 26. The motion did not make any constitutional

40

complaints. At most, it may have given the trial court vague notice of factual or legal insufficiency claims, though this language is also insufficient under Tex. R. Civ. P. 322. (specifically noting that the statement "the verdict of the jury is contrary to law" is insufficient). Despite the insufficiency of this motion, the trial court granted Appellant a hearing. 3 RR 1. Attorney for Appellant admitted to the court that the motion was very general. *Id.* at 4. At the hearing, Appellant's attorney stated: "The Stalking Protective Order […] has some clauses in there that make it really *difficult* for Ms. Eckchum to live her life and take advantage of all the freedoms that we have in this country under the Constitution." *Id.* at 10 (emphasis added). She stated that "the order says she can't go half a mile -- 10,000 yards -- of a school in Wimberley, Texas." *Id.* She informed the court that she believed the order was vague regarding Mr. Ketchum's workplace and his children's school and that "there may be due process issues," with regards to a "relatively low standard of proof." *Id.* at 10, 21-22.

Appellant did not state whether she believed the order violated the Texas Constitution or the Federal Constitution, nor did she cite any specific provision. The vagueness of Appellant's assertion was evident when the trial court asked the State for a response, and the State asked if she possessed any case law that would shed light on her claim. *Id.* at 22. None was given. *Id.* It was unclear in the motion for new trial as well as the arguments at the hearing what complaints Appellant

41

was raising. *See Id.* at 21 (noting trial court was at times uncertain as to what rights Appellant was arguing had been violated); *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (ruling that appellant's general objections in his Motion to Suppress that statements made were in violation of constitutional and statutory provisions were not enough to preserve error on appeal); *Heidelberg v. State*, 144 S.W.3d 535, 537-38 (Tex. Crim. App. 2004) (noting that it is well settled that the legal basis of a complaint raised on appeal cannot vary from that raised at trial).

The trial court made no specific rulings as to particular constitutional arguments, only stating that "for the record the Motion for a New Trial is denied." 3 RR 17. The hearing on the motion for new trial was held more than 30 days after the motion was filed, and Appellant's argument at the hearing was an attempt to amend the original insufficient motion. *Moritz v. Preiss*, 121 S.W.3d 715, 720-21 (Tex. 2003) ("to give full effect to our procedural rules that limit the time to file new trial motions, today we hold that an untimely amended motion for new trial does not preserve issues for appellate review, even if the trial court considers and denies the untimely motion within its plenary power period").

Both the motion for new trial and the complaints raised at the hearing were insufficient to enable the trial judge to clearly understand what was alleged as error. Appellant never mentioned any First Amendment issues, and has failed to preserve it for appeal.

In the alternative, even if the Court finds Appellant preserved her argument, the trial court's order did not criminalize her protected speech. Appellant argues that her First Amendment Rights were violated when the trial court prohibited her from:

1. Going within 100 feet of any venue where applicant is performing during the following times: during applicant's performance, three hours prior to applicant's performance, and three hours immediately after applicant's performance;
2. Taking photos or images of applicant, his children, spouse, grandchildren, or anyone else in his household.

CR 19.

She contends that, if violated, she could be charged with the criminal offense of Violation of Protective Order under Tex. Pen. Code. §25.07, subjecting her to possible jail time. Appellant believes this prohibits her from taking photos at public events and public places, improperly criminalizing her protected speech. Specifically, Tex. Pen. Code. §25.07 reads:

> A person commits an offense if, in violation of a condition of bond set in a […] stalking case and related to the safety of a victim or the safety of the community, an order issued under Article 17.292, Code of Criminal Procedure, an order issued under Section 6.504, Family Code, Chapter 83, Family Code […] or Chapter 85, Family Code, or an order issued by another jurisdiction as provided by Chapter 88, Family Code, the person **knowingly or intentionally**:
> (1) commits family violence or an act in furtherance of an offense under Section 22.011, 22.021, or 42.072;
> (2) **communicates**:
> (A) **directly with a protected** individual or a member of the family or household in a threatening or harassing manner;

43

(B) **a threat through any person to a protected individual** or a member of the family or household; or

(C) **in any manner with the protected individual** or a member of the family or household **except through the person's attorney** or a person appointed by the court, if the violation is of an order described by this subsection and the order prohibits any communication with a protected individual or a member of the family or household;

(3) **goes to or near any of the following places as specifically described in the order** or condition of bond:

(A) **the residence or place of employment or business** of a protected individual or a member of the family or household; or

(B) **any child care facility, residence, or school** where a child protected by the order or condition of bond normally resides or attends;

(4) possesses a firearm.

Tex. Pen. Code. §25.07 (emphasis added).

It is important to note that the statute only makes criminal the above specified acts that are done knowingly or intentionally. *Id*. Appellant believes she will be held criminally liable if she takes a photo and accidentally captures an image of Mr. Ketchum standing in the background. This is not the case. She must also exhibit the specified mental state. Certainly the restrictions placed on Appellant require her to be proactive before deciding to go to a music venue to ensure that Mr. Ketchum is not playing there, but that it neither difficult nor unreasonable under the circumstances.

As Appellant notes, while the right of free speech is guaranteed in the Constitution, the government may prohibit communication when "substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen,* 403 U.S. at 21. In *Ploeger*, the court noted that "while conduct does not lose First Amendment protection merely because the actor intends to annoy the recipient, such conduct is much less likely to enjoy protection where the actor intends to frighten the recipient, 'and such conduct is unlikely to enjoy **any** protection where the actor intends the place the recipient in fear of death or bodily injury.'" 189 S.W.3d at 812 (emphasis added) (citing *Long,* 931S.W.2d at 293; *Clements,* 19 S.W.3d at 451).

In addition, to the extent Appellant claims she is a news journalist, "the right to speak and publish does not carry with it the unrestrained right to gather information." *Connell v. Town of Hudson*, 733 F. Supp. 465, 468 (D.N.H. 1990). In *Connell*, as in a number of the media cases cited by Appellant, what the court considered was a newsperson's right to gather news at a traffic wreck where police were attempting to secure the location, and the newsman was interfering with that procedure. *Id*. at 465. This is vastly different from Mr. Ketchum's case. It has already been established from the record that Appellant has knowingly placed Mr. Ketchum and his family in great fear of bodily injury and death due, in part, to the photos she constantly takes of them and her appearances at his concerts. As a

successful musician, these venues are often Mr. Ketchum's place of employment. Even though Appellant claims her acts are innocent, the evidence suggests otherwise, and the trial court found that she had committed stalking. *See Ploeger,* 189 S.W.3d at 813 (holding that, as applied to appellant, stalking statute was not unconstitutional despite his claim he was only courting victim; and in light of the evidence his conduct was removed from First Amendment protection).

In regards to protective order statutes that prohibit communication, The Third Court of Appeals of Austin has stated that although certain prohibitions my sometimes apply to any manner of communication, "[§ 25.07(A)(2)(c)] only prohibits communication in the context of a pre-existing court order issued against a person […] based upon a finding that family violence has occurred or will occur in the future. Thus the section has a narrowly defined scope, limited to persons who's prior actions toward the protected individual were of such a threatening nature that a court felt justified in issuing a protective order against that person." *Garcia v. State*, 212 S.W.3d 877, 889 (Tex. App.—Austin 2006, no pet.) In the same sense, Appellant has already been found to have committed stalking, is only prohibited from going to venues where Mr. Ketchum is performing, and then only for a specific amount of time. In light of Appellant's threats, nothing in the trial court's order as applied to section 25.07 reaches a substantial amount of constitutionally protected conduct, nor is it reasonable to assume that Appellant

46

would stop stalking Mr. Ketchum if the trial court had granted only a two year protective order. Due to Appellant's history and the decades of documented stalking, the trial court was within its power to issue the lifetime order. *See e.g.* Tex. Crim. Pro. Code. Art. 7A.05 (directing the judge to order offender to take action as specified by the court that the court determines is necessary or appropriate to prevent or reduce the likelihood of future harm to the applicant or a member of the applicant's family); Tex. Crim. Pro. Code. Art. 7A.07(a) (stating a protective order may be effective for the duration of the lives of the offender and victim); Appellant should not be allowed to use her unpaid 'journalism' as a shield to continue stalking Mr. Ketchum. By Appellant's logic, John Hinckley could become an unpaid 'celebrity journalist,' and the Court's would be powerless to stop him from approaching Jodi Foster or Nancy Regan to 'photograph' them. Thankfully, courts do not agree Appellant's position. *See e.g. Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (noting it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389 (1992); *Lewis v. S. S. Baune*, 534 F.2d 1115, 1122 (5th Cir. 1976); *Smith v. Martens*, 279 Kan. 242, 254-55, 106 P.3d 28, 38 (2005); *Champagne v. Gintick*, 871 F. Supp. 1527, 1532 (D. Conn. 1994) (providing

47

protection from stalking conduct is at the heart of the state's social contract with its citizens, who should be able to go about their daily business free of the concern that they may be the targets of systematic surveillance by predators who wish them ill).

**3. No false testimony was elicited at the hearing, and Appellant has failed to prove any misleading testimony existed. Additionally, Appellant has failed to properly preserve this complaint for appeal.**

To avoid undue repetition, the same arguments and authorities given *supra* (at 40-43) apply equally to this point of error. Appellant did not properly raise a due process argument relating to alleged false testimony at the original hearing, in her motion for new trial, or at the hearing on the motion for new trial. *See generally* 2 RR 10, 21-22; 3 RR (Appellant's attorney did not make specific objections to Mr. Ketchum's testimony regarding alleged "false protective order"; CR 26. At the hearing on the motion for new trial, Appellant's attorney only made one mention of due process in regards to "standard of proof," stating that the order "effects her for the rest of her lifetime [and] there's some due process issues there". 3 RR 21-22. No due process issue regarding alleged false testimony was ever raised, nor did Appellant attempt to introduce any new evidence of alleged false testimony, which would require a formal bill of exception for preservation. *See Lancaster*, 01-12-00909-CV, 2013 WL 3243387 *1 (holding appellant must file a

formal bill of exception when complaining about a matter that would not otherwise appear in the record) (citing Tex. R. App. P. 33.2(e)(1)).

In the alternative, even if the Court finds Appellant preserved her argument, Appellant has offered no evidence to support her contention that Mr. Ketchum testified "falsely" or violated Appellant's due process rights as a result. Appellant contends that proof of the alleged falsity is proven by Appellant's own testimony denying she has ever had a protective order issued against her and the State's failure at the hearing to introduce a certified copy of a prior protective order. Appellant's argument is circular in nature, insisting that a prior protective order must not exist because, otherwise, the State would have introduced it.

At least in the context of criminal cases, even assuming false testimony was introduced, which the State denies, it must be material to the jury's determination of guilt or convey a false impression. *See, e.g., Ex Parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012) (finding no due process violation despite undisputed and unequivocal evidence that witness lied about identity of murderer); *Ex parte Ghahremani*, 332 S.W.3d 470, 481 (Tex. Crim. App. 2011) (holding that applicant is also required to show that a due process violation was not harmless in the context of possible false testimony). In *Chavez*, the court pointed out the evidence of the witness's false testimony was undisputed because the real shooter later came forward. 371 S.W.3d 208. In addition, the witness was subject to cross-

examination by defense counsel regarding his observations, thus negating the misleading nature of his statements. *Id.* at 209. Alternatively, in *Ghahremani*, the court found that exculpatory evidence was intentionally concealed and was thus material considering the fact that applicant was unable to raise the claim at the trial. 332 S.W.3d 483.

In the present case, Mr. Ketchum emphatically insisted that he had a prior protective order out of Kentucky. 2 RR 33-34. Despite the fact that the State did not have a copy in its possession, Appellant has not offered unequivocal evidence of "false" testimony.[1] Nor has Appellant shown that Mr. Ketchum's assertion regarding the prior protective order was material to the trial court's ruling. The only piece of evidence which might be helpful in this case would be the trial court's findings of fact and conclusions of law, which Appellant never requested. The overwhelming body of evidence on record supports the trial court's granting of the protective order. Mr. Ketchum was subject to thorough cross-examination regarding the issue. 2 RR 27, 28, 30, 33, 34, 39. *Id.* at 28. When specifically asked by the trial court whether the State had a prior order in its possession, Mr.

---

[1] Appellant repeatedly makes references to alleged evidence in her appendix and throughout her brief that are outside the record. The case law is clear; an appellate court may not consider matters outside the appellate record. *Siefkas v. Siefkas*, 902 S.W.2d 72, 74 (Tex. App.—El Paso 1995, no writ); *Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex. 1979).

Robinson answered "no, Your Honor, just the police report." *Id* at 28. The court acknowledged this and told the parties to move on. *Id*. The trial court was not left with any false or misleading impressions.

Appellant additionally argues that the State made false claims when alleging the grounds for stalking in its application for temporary protective order. Appellant mis-cites the temporary order. The provisions listed under **"IMMEDIATE ORDER SOUGHT"** are specific requests that the State made to the reviewing judge. CR 4. These include the standard prohibitions against Appellant committing stalking, communicating with the victim, or going near his residence. *Id* at 4-6. This portion of the temporary order mirrors the section titled **"PRAYER,"** again laying out the relief the State sought. *Id*. at 6-7. There is a distinct and separate portion of the temporary order titled **"GROUNDS FOR APPLICATION."** *Id*. at 6. Here, the State explicitly laid out the acts engaged in by Appellant. *Id*. The State did not allege that Appellant was stalking a person currently protected by an order. *Id*. Only Mr. Ketchum's affidavit mentions that on February 14, 1997, in Nashville, Tennessee, he received a **restraining** order against Appellant. *Id*. at 8-9 (emphasis added). He never alleged in his affidavit that he had a protective order. *Id*. There is no requirement that restraining orders be attached to protective order applications, and the relevant code was never invoked as Appellant suggests. Tex.

Fam. Code Ann. §82.008. (stipulating that only "previously rendered protective orders" be attached to applications for protective orders).

In any event, Appellant has failed to show how these facts or lack of facts materially misled the trial court or violated her due process. There was no false impression created in the court's mind, and the entirety of the evidence supported the court's grating of the final stalking protective order.

**4. The trial court did not err in granting relief specified in State's application for stalking protective order, and Appellant has failed to preserve this complaint for appellate review.**

Appellant alleges that the State filed a family violence protective order and that the trial court improperly granted a stalking protective order. To the extent Appellant is making a due process claim, and to avoid undue repetition, the same arguments and authorities given *supra* (at 40-43) apply equally to this point of error. Appellant failed to properly raise the issue at the original hearing, in her motion for new trial, or at the hearing on the motion for new trial. At the original hearing Appellant's attorney stated she received notice and that she understood that the State was pursuing a stalking protective order. 2 RR 9. At the hearing on the motion for new trial, Appellant's attorney only made one mention of due process in regards to "standard of proof," stating the order "effects her for the rest of her lifetime there's some due process issues there," and Appellant's motion for new

trial did not specifically raise any constitutional complaints. 3 RR 21-22; *see also* CR 26. No issue regarding notice was raised.

In the alternative, even if the Court finds Appellant preserved her argument, Appellant was given fair notice of the claims being asserted, and she has failed to show any harm. Generally, as cited by Appellant, the pleadings must support the relief granted, and the petition must give fair notice of the claims being asserted to the extent the court can reasonably infer such claims. *Moreno v. Moore*, 897 S.W3d 439, 442 (Tex. App.—Corpus Cristi 1995, no writ) (citing *Cunnigham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983)). The Texas Family Code Ann. § 82.041 sets out the notice requirements for protective orders in general. Considered alongside Tex. R. Civ. P. 301, the statute does "not require that either the application or the notice specify the act or acts which precipitated the claim […] even as to the time or place it occurred, or any other information except for the name of the applicant and the date and time of the hearing." *State for Prot. of Cockerham v. Cockerham*, 218 S.W.3d 298, 307 (Tex. App.—Texarkana 2007, no pet.) "The purpose of the pleading requirements of Tex. R. Civ. P. 301 are to provide notice of the matters to be heard," and the requirements exists to allow a respondent the opportunity to "marshal a defense." *Id*. at 308.

On December 16, 2014, the State filed an "Application for Protective Order" on behalf Mr. Hal Ketchum against "Suzanna Ekchum; AKA Susan Eckhert." CR

4. In the application, Mr. Ketchum was named as a "victim of stalking," and the front page of the application stated that there was a "clear and present danger of stalking if the order was not granted." *Id.* The application never stated or claimed that the State was seeking a family violence protective order, and no such language was used in the application. The first paragraph of the application does state that the order was being sought pursuant to Chapter 85 of the Texas Family Code. *Id.* However, this is an accurate statement of the code, as stalking protective orders under Chapter 7(A) of the Code of Criminal Procedure make numerous cross-references to provisions in the Family Code regarding protective orders. *See* Tex. Crim. Pro. Code. Art. 7A.04. (stating under the heading "APPLICATION OF OTHER LAW" that, "to the extent applicable, except as otherwise provided by this chapter, Title 4, Family Code, applies to a protective order issued under this chapter.").

On January 16, 2015, the trial court held a hearing on the Final Protective Order. 2 RR 1. At the hearing, attorney for Appellant, Patty Morris, brought it to the court's attention that the order being sought by the State was a stalking protective order. 2 RR 6-9. It plain from the record that she wanted to clarify to the trial court that a family violence situation had not occurred and that the State was seeking a stalking protective order. *Id.* at 9. She informed the court that she understood Appellant had been accused of stalking. *Id.* She stated that the State

54

clarified any misunderstandings she may have had by telling her twelve days prior to the hearing that it was indeed pursuing a stalking protective order, not a family violence protective order. *Id.* at 7. The trial judge stated that there was only one sentence in the application that made reference to the family code, and that it was clearly a stalking protective order. *Id.* at 8. The trial judge asked if she was objecting to anything specific, including due process. *Id.* at 9. Appellant never objected or complained of due process and told the court that there was nothing further she wished to discuss, nor did she request a continuance. *Id.* In her motion for new trial, the issue was never raised. CR 26; *See also Kissman v. Bendix Home Sys., Inc.*, 587 S.W.2d 675, 677 (Tex. 1979) (noting that relief consistent with the theory of the claim reflected in the petition may be granted under a general prayer).

The State never alleged that it was seeking a family violence protective order, nor could it be inferred from the application the State filed or the record. Appellant's attorney acknowledged that the State was seeking a stalking protective order. *Id.* at 9. Mr. Ketchum's affidavit directly accused the Appellant of stalking. CR 8. In the State's application, under "GROUNDS FOR APPLICATION," the State alleged Appellant engaged in stalking, and the specific relief requested by the State in its "PRAYER" was to prevent Appellant from "committing stalking." CR 6. The prayer also requests "for such relief in law or in equity to which Applicant shows just entitlement" and "general relief." CR 7. Also, the Writ states: "an

55

application for a protective order has been filed in the court stated in this notice alleging that you have committed Stalking." *Id.* at 13. At the end of the original hearing on the final stalking protective order, the state formally stated; "specifically we're requesting a **lifetime** protective order." 2 RR 116 (emphasis added).

Appellant did not properly preserve her argument for appeal, and based on the evidence heard at the hearing, the trial court properly granted the stalking protective order for a lifetime duration. *See e.g.* Tex. Crim. Pro. Code. Art. 7A.05 (directing the judge to order offender to take action as specified by the court that the court determines is necessary or appropriate to prevent or reduce the likelihood of future harm to the applicant or a member of the applicant's family); Tex. Crim. Pro. Code. Art. 7A.07(a) (stating a protective order may be effective for the duration of the lives of the offender and victim); *Teel v. Shifflett*, 309 S.W.3d 597, 602 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (holding that a reviewing court should liberally construe the petition to contain any claims that reasonably may be inferred from the specific language used in the petition and uphold the petition as to those claims, even if an element of a claim is not specifically alleged).

**5. The court did not exclude testimony relevant to Mr. Ketchum's allegations, and Appellant has failed to preserve this complaint for appeal. Nor did the trial court err in concluding that the order was necessary.**

Appellant has waived her complaint that she was not allowed to present specific evidence and ask specific questions of Mr. Ketchum since she has failed to preserve her claim with a formal bill of exception. *See Lancaster*, 01-12-00909-CV, 2013 WL 3243387 *1 (holding appellant, who complained that he was not allowed to ask specific questions on cross-examination, failed to preserve the issue by filing a formal bill of exception) (citing Tex. R. App. P. 33.2(e)(1)).

In addition, "Trial courts retain great latitude in imposing reasonable limitations on cross-examination." *Riley v. State*, 01-95-01020-CR, 1997 WL 72013, at *2 (Tex. App.—Houston [1st Dist.] Feb. 13, 1997, pet. ref'd)(not designated for publication). In the present case, Appellant was allowed a lengthy cross-examination of Mr. Ketchum, despite the trial court overruling Appellant's objection that Mr. Ketchum was non-responsive. 2 RR 35. The entire record details Appellant's threatening behavior. Mr. Ketchum testified at length as to the stalking that Appellant committed against him over many years, including standing in his yard and going through his mail, threatening him at a birthday gathering, following him through town, and following his daughter. *Id.* at 13, 16, 17, 18, 38.

For these reasons, as shown by the entire record, sufficient evidence existed for the trial judge to find that Appellant committed stalking and that a lifetime

stalking protective order was necessary for the protection of Mr. Ketchum and his family.

# **PRAYER**

Based on the foregoing arguments, the State prays that this Court uphold the decision of the trial court and find that Appellant is not entitled to any relief.

Respectfully submitted,

Jennifer Tharp
Criminal District Attorney

By

/s/ Nicholas D. Robinson
Nicholas D. Robinson
SBN: 24067844
Criminal Prosecutor
150 N. Seguin Avenue, Ste. #307
New Braunfels, Texas 78130
(830) 221-1300
Fax (830) 608-2008
E-mail: robinn@co.comal.tx.us
Attorney for the State

## Certificate of Service

I, Nicholas D. Robinson, attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this Brief for the State has been delivered to Appellant SUZZANA ECKCHUM's attorney of record in this matter:

Mysha Lubke
Baker Botts L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701
Phone: (512) 322-2500
Fax: (512) 322-2501
E-mail: mysha.lubke@bakerbotts.com
*For the Appellant on Appeal*

By electronically sending it through e-file.txcourts.gov, this 6th day of November 2015.

/s/ Nicholas D. Robinson
Nicholas D. Robinson

## Certificate of Compliance

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are 14,591 words or less within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text.

/s/ Nicholas D. Robinson
Nicholas D. Robinson